## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE:<br><br>Charlie Kelly,<br><br>　　　　　　　　　　Debtor. | C/A No. 15-06419-DD<br><br>Chapter 13<br><br>**ORDER** |

This matter is before the Court for hearings on the following: (1) a confirmation hearing on Charlie Kelly's ("Debtor") amended chapter 13 plan filed March 30, 2016,[1] [Docket No. 36] (2) an amended motion for relief from stay filed by creditor Royals Portfolio, LLC ("Royals"), [Docket No. 11] and (3) a motion to sell free and clear filed by Debtor [Docket No. 22]. A hearing was held on April 13, 2016. At the hearing, Debtor's counsel indicated that Debtor was not proceeding on the motion to sell. At the conclusion of the hearing, the Court took the matters of confirmation and relief from stay under advisement. The Court now issues the following findings of fact and conclusions of law.

### FACTS

1.　　Debtor's deceased wife, Mozelle Kelly, once operated an assisted living facility, Pinewood Care Home, Inc. The land on which the Pinewood Care Home facility was located (the "Pinewood Property") is adjacent to 2800 McCords Ferry Road, Eastover, SC 29044 ("the McCords Ferry Property"), Debtor's home.

2.　　Between 1989 and 1993, NCNB South Carolina and its successor in interest, NationsBank of South Carolina, provided two commercial loans to Pinewood Care Home, Inc. in the amounts of $950,000.00 and $350,000.00. Each loan was secured by a mortgage on both the

---

[1] Debtor previously filed an amended plan on February 19, 2016 [Docket No. 18]. Royals Portfolio, LLC filed an objection to confirmation on March 17, 2016 [Docket No. 29]. The March 30 amended plan does not change the treatment of Royals Portfolio, LLC or the amount of trustee payments, but adds Richland County Treasurer as a priority creditor.

Pinewood Property and the McCords Ferry Property, both of which were owned at that time by Pinewood Care Home, Inc. Both mortgages contained assignment of rents provisions.

    3.    Pinewood Care Home, Inc. defaulted on the notes. Ultimately, Bank of America, successor to NationsBank, and Pinewood Care Home, Inc. reached an agreement whereby Pinewood Care Home, Inc. would sell the Pinewood Property and remit the proceeds to Bank of America. In turn, Bank of America would release its mortgages on the Pinewood Property. The sale was consummated, and after the sale, the only remaining collateral for the loans was the McCords Ferry Property.

    4.    In October 2002, Bank of America transferred its interest in the mortgages to Royals.

    5.    In March 2004, Pinewood Care Home, Inc. transferred the McCords Ferry Property to Mozelle Kelly and Debtor. Upon Mozelle Kelly's death, Dorothy Simpson, a daughter of Mozelle Kelly and Debtor, inherited Mozelle Kelly's half interest in the McCords Ferry Property.

    6.    Royals subsequently filed a foreclosure action on the McCords Ferry Property. On March 9, 2009, to stay the foreclosure action, Debtor filed a chapter 13 bankruptcy case (Case No. 09-1779).

    7.    In that chapter 13 case, Royals, Debtor, and Ms. Simpson entered into an Agreement Regarding Existing Debt, pursuant to which Ms. Simpson and Debtor agreed that they were indebted to Royals in the amount of $400,000.00. The Agreement required Ms. Simpson and Debtor to strictly comply with the repayment terms of the Agreement, which provided for the repayment over time of a reduced sum of money. The Agreement referred to the McCords Ferry Property as a "single family residential home" and as "the 'Kelly Residence'". Shortly after the parties entered into the Agreement, that chapter 13 case was dismissed.

2

8. Debtor and Ms. Simpson failed to comply with the Agreement, and Royals filed another foreclosure action. A foreclosure decree was entered, from which Ms. Simpson and Debtor appealed. They did not post an appeal bond and the foreclosure sale was not stayed pending appeal.

9. Next, Ms. Simpson filed a chapter 13 bankruptcy petition on May 1, 2015 (Case No. 15-02401-hb), which did stay the foreclosure sale. On her schedules, Ms. Simpson reported a half-interest in the McCords Ferry Property and indicated that it was her principal residence. Ms. Simpson reflected Royals' debt on Schedule D in the amount of $45,000.

10. Ms. Simpson's case was ultimately converted to a chapter 7 case and her discharge was waived based on her failure to disclose assets and income. Royals obtained relief from stay in Ms. Simpson's bankruptcy case on August 12, 2015 and moved forward with foreclosure.

11. Debtor filed the present case on December 2, 2015.

12. Debtor's only significant asset is the McCords Ferry Property.

13. Debtor's schedules reveal that his only creditors are Royals, his bankruptcy attorney, and Amcol Systems, a collection agency for a debt to Doctors Care. Debtor reported monthly income on his original Schedule I of $836.00 from Social Security and $2,200.00 in contributions from his other daughter, Betty Taylor.

14. Debtor's December 2, 2015 plan proposed to pay Royals $2,203.00 per month based upon a $116,000.00 secured claim and moved the Court for an order establishing that as the value of the McCords Ferry Property. Royals filed an objection on December 30, 2015 [Docket No. 9].

3

15. Debtor amended his schedules on March 30, 2016 and noted a reduced contribution from Ms. Taylor of $1,150.00 per month and additional income of $150.00 per month from miscellaneous odd jobs. Debtor testified that he does not receive this $150.00 every month.

16. Debtor filed amended plans on February 19, 2016 and March 30, 2016, reflecting his half interest in the McCords Ferry Property, and proposing a value of $52,000.00 and payments toward the debt of $988.00 per month. Royals again objected.

17. The chapter 13 trustee reported that Debtor was two months ahead with plan payments at the time of the confirmation hearing.

18. Royals and Debtor stipulated the value of the McCords Ferry Property as $104,000.00. Thus, the value of Debtor's half-interest in the McCords Ferry Property is $52,000.00.

19. Royals filed a proof of claim on April 6, 2016 in the amount of $436,675.23. Subsequent to the April 13 hearings, Debtor filed an objection to Royals' claim, asserting that the $121,702.29 in attorneys' fees claimed by Royals is unreasonable [Docket No. 43]. In the interim, before issuance of this order, the parties settled the claims objection.[2]

20. Debtor is eighty-five (85) years old. He built the home on the McCords Ferry Property and has lived there since about 1960. He shared the home with his wife until her death in August 2005 and continues to live there. His two daughters grew up in the house.

21. The testimony shows that Mrs. Kelly kept boarders at the McCords Ferry Property, and Ms. Simpson continues to do so.

22. Ms. Loretta Nixon, a caretaker who currently works at the McCords Ferry Property, testified that the boarding house operation dates back to before Pinewood Care Home, Inc. closed.

---

[2] The settlement reduced Royals' claim by $7,000.00, allowing the claim in the total amount of $429,675.23 [Docket No. 49].

4

Debtor testified that no boarders lived in the house while Pinewood Care Home, Inc. was operating. However, Ms. Nixon testified that some of the residents from the Pinewood Care Home facility stayed in the house.

23. At the time of Ms. Simpson's bankruptcy filing, there were five boarders living at the McCords Ferry Property in addition to Debtor. At the time of Debtor's confirmation hearing, one boarder was living at the McCords Ferry Property.

24. Debtor testified that Ms. Simpson handles all of his financial affairs. When questioned about debts owed to Amcol Systems and Richland County Treasurer and Ms. Taylor's contributions to his monthly income, Debtor testified that he knew nothing about the debts and that he did not know anything about the $2,200.00 monthly contribution reported in his original schedules.

25. Debtor described the McCords Ferry Property on his original Schedule A/B as a single-family home and noted in Schedule I that Ms. Simpson operates a small boarding facility at the property. On his amended schedules, Debtor lists the McCords Ferry Property as both a single family home and a business premises.

26. Richland County Tax Assessor documents show the McCords Ferry Property is taxed as residential property.

27. Ms. Simpson testified that the property is insured in the amount of approximately $250,000.00 and is insured as a single family residence.

28. Ms. Taylor testified regarding her ability to provide Debtor with money every month. Ms. Taylor testified that prior to Debtor's bankruptcy case, she gave Debtor a little money "here and there." Ms. Taylor testified that she is willing and able to provide Debtor $1,250 per

5

month for 60 months.  Ms. Taylor testified that she has made all of Debtor's payments to the chapter 13 trustee since the filing of Debtor's bankruptcy.

29.    Ms. Taylor's July 23, 2015 financial statement shows a net worth of over $2.9 million.  Ms. Taylor also testified that she has been approved for a $110,000.00 line of credit, which she had planned to use to purchase the McCords Ferry Property.

30.    Royals filed its Motion for Relief from Stay on December 30, 2015 [Docket No. 8], and amended the motion on January 6, 2016 [Docket No. 11].  Debtor objected to the motion on January 18, 2016 [Docket No. 13].  Royals' motion seeks relief from stay pursuant to section 362(d)(1), (2), and (4).

## CONCLUSIONS OF LAW

1. **Confirmation**

Debtor seeks confirmation of his proposed chapter 13 plan filed March 30, 2016.  In order to be confirmed, a plan must meet certain requirements set forth in 11 U.S.C. § 1325.  Section 1325(a) requires that a plan proposed for confirmation comply with the provisions of chapter 13 and other applicable provisions of title 11.  One such provision is section 1322(b).

The crux of the parties' dispute as to confirmation of Debtor's chapter 13 plan is whether Royals' claim can be bifurcated into secured and unsecured components pursuant to section 506.[3] Section 1322(b) provides, in relevant part:

> Subject to subsections (a) and (c) of this section, the plan may— . . .
> (2) modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence*, or of

---

[3] Section 506 provides, in relevant part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim.

6

holders of unsecured claims, or leave unaffected the rights of holders of any class of claims.

(emphasis added). Debtor argues that section 1322(b) is not a bar to valuation because the original loans to Pinewood Care Home, Inc. were made for a commercial purpose and included additional real property as collateral, and because the McCords Ferry Property is currently being operated as a boarding house. Additionally, Debtor indicated in the amended joint statement of dispute filed by the parties on March 21, 2016 [Docket No. 32] that the assignment of rent clauses in the original mortgage documents constituted additional collateral. Royals argues that its claim secured by the McCords Ferry Property cannot be modified under section 1322(b) because the McCords Ferry Property is Debtor's principal residence and its claim is not secured by any other collateral.

This Court has recently considered this issue in a chapter 11 context in *In re Crump*, 529 B.R. 106 (Bankr. D.S.C. 2015). *Crump* is instructive because chapter 11 and chapter 13 contain the same limitation on modification of secured claims secured only by a debtor's principal residence.[4] In *Crump*, the Court found that the claim at issue could not be modified because, although the original mortgage included collateral in addition to the debtor's principal residence, the creditor had released its lien on the additional collateral, leaving the debtor's principal residence as the only collateral. The Court found that the creditor's claim was a "claim secured only by a security interest in real property that is the Debtor's principal residence," and therefore, the language of section 1123(b)(5) prevented modification.

The present case demands the same result. While Royals' predecessor originally held a mortgage on both the Pinewood Property and the McCords Ferry Property, everything but the

---

[4] Section 1123(b)(5) provides, "Subject to subsection (a) of this section, a plan may -- . . . modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims."

7

McCords Ferry Property was sold as part of a settlement between the parties, and the liens on the Pinewood Property were released.  The fact that the loans were originally secured by additional property is immaterial.  Royals' claim is now secured only by the McCords Ferry Property.

Debtor's argument that the assignment of rents clauses in the original mortgage documents constitute additional collateral is also unavailing.  Section 101(27B), the bankruptcy code's definition of incidental property, specifically includes "rents" in connection with a determination concerning what is included in a debtor's principal residence.  Most courts that have considered this question have found that rents do not constitute additional collateral precluding the application of the anti-modification provision of section 1322(b)(2).[5]  The assignment of rents clauses contained in the original mortgage documents are incidental and do not change the character of Royals' security interest or serve as additional collateral.

In addition to his arguments regarding the original character of the loans and the existence of additional collateral, Debtor argues that the use of the McCords Ferry Property as a boarding house changes its character as a principal residence.  Courts do not agree on whether sections 1123(b)(5) and section 1322(b) require that the property be used <u>only</u> as a principal residence.  Some courts find that if the debtor's residence is also used for some other purpose, the anti-

---

[5] *Didlake v. Wachovia Bank (In re Didlake)*, 454 B.R. 349, 352 (Bankr. W.D. Va. 2011) (finding that rents fall within the definition of "debtor's principal residence" pursuant to section 101(13A) and 101(27B)); *In re Mayer-Myers*, 345 B.R. 127, 130-31 (Bankr. D. Vt. 2006) (examining Vermont law and finding that it considers rents an additional aspect of a security interest in land; stating, "The Court's holding today is consistent with a majority of cases that have considered this question and concluded that where a home mortgage recites a security interest in collateral that is an incident of the real property securing the mortgage lien, no 'additional' security interest has been given and the creditor is protected against modification.").

modification provision does not apply.[6] Other courts permit some dual use.[7] Still other courts apply a case by case analysis, determining the intentions of the parties by examining the loan documents and the specifics of the transaction.[8] The Fourth Circuit has not ruled on this particular issue.

This Court agrees with those courts that hold that if property is the only collateral for a secured creditor's claim and is used as the debtor's principal residence, the mere fact that the property or a portion of the property is used for some other purpose does not preclude the application of the anti-modification provisions in section 1123(b)(5) and section 1322(b). The split

---

[6] *See Scarborough v. Chase Manhattan Mortg. Corp. (In re Scarborough)*, 461 F.3d 406 (3d Cir. 2006); *Lomsa Mortg., Inc. v. Louis*, 82 F.3d 1 (1st Cir. 1996) (examining and discussing legislative history of section 1322(b)(2) and finding that the anti-modification provision does not apply to secured claim on multi-unit property, in which one unit was debtor's principal residence); *In re Stivender*, 301 B.R. 498, 500 n.2 (Bankr. S.D. Ohio 2003) (stating in footnote, "The antimodification provision of 11 U.S.C. § 1322(b)(2) does not protect a mortgage secured by a multi-family structure in which only one unit is used as the debtor's residence.").

[7] *See Wages v. J.P. Morgan Chase Bank, N.A. (In re Wages)*, 508 B.R. 161 (B.A.P. 9th Cir. 2014) ("We hold that the anti-modification exception applies to any loan secured only by real property that the debtor uses as a principal residence property, even if that real property also serves additional purposes."); *Utzman v. Suntrust Mortg., Inc.*, 2016 WL 795739 (N.D. Ca. Mar. 1, 2016) (discussing section 1123(b)(5), examining legislative history and finding that it does not require property to be used only as a principal residence for anti-modification provision to apply, rejecting reasoning in *Scarborough* and stating, "[S]ection 1123(b)(5) requires the real property be used as the debtor's principal residence; it does not require the real property be used *solely* as the debtor's principal residence, or be deemed the debtor's principal residence in light of the totality of the circumstances."); *In re Springmann*, 328 B.R. 251 (Bankr. D.D.C. 2005) (considering chapter 7 debtor's ability to exempt full value of his home despite using part of it as a law office and renting out bedrooms, discussing case law under section 1123(b)(5) and section 1322(b)(2) and stating, "If the rental of a bedroom prevented that room from being part of property used as a debtor's residence for purposes of the District's residence exemption . . . that would mean . . . that the mere renting of a bedroom . . . would deprive the debtor's home mortgage of the protection of the antimodification provisions of 11 U.S.C. § 1123(b)(5) and § 1322(b)(2). As a matter of common sense, one would not think that renting out a bedroom . . . in a single family residence would mean that the home mortgage debt is not 'a claim secured only by a security interest in real property that is the debtor's principal residence.'"); *In re Macaluso*, 254 B.R. 799, 800 (Bankr. W.D.N.Y. 2000) (discussing section 1322(b)(2) and finding that the word "only" modifies the word "secured" not "principal residence", stating, "[T]he statute does not limit its application to property that is used *only* as a principal residence, but refers generally to any parcel of real property that the debtor uses for that purpose. So long as the only collateral is a single parcel of real estate, it matters not that that parcel may fulfill many uses or be divided into many units. The statutory requirements are fulfilled whenever the debtor principally resides in that real estate or some part thereof.").

[8] *In re Zaldivar*, 441 B.R. 389 (Bankr. S.D. Fla. 2011) (holding that "the predominant character of the transaction governs whether the anti-modification provision applies," and finding that the mortgage documents at issue indicated that the transaction was a commercial transaction, such that the anti-modification provision of section 1322(b)(2) did not apply); *Brunson v. Wendover Funding, Inc. (In re Brunson)*, 201 B.R. 351 (Bankr. W.D.N.Y. 1996) (adopting a totality of the circumstances analysis for determining application of the anti-modification provision, stating, "This Court today rejects substantial authority to the effect that strip-down of a residential mortgage is always permitted, as a matter of law, as to multi-family dwellings in a Chapter 13 case. This Court believes that the antimodification provision, 11 U.S.C. § 1322(b)(2), may apply in some such instances, depending on the facts of the particular case.").

in the decisions turns on whether a court adopts the view that the statutes exclude modification of claims only secured by real property that is the debtor's principal residence or secured by property that is only the debtor's principal residence. This difference is significant. The placement of the word "only" in the statute indicates that Congress intended the former, not that it intended to allow a debtor to modify a claim on his principal residence if he uses it for any purpose other than his home.

The facts here are distinguishable from many of the cases finding that the anti-modification provision does not apply, because the properties in those cases were multi-unit properties, in the nature of an apartment building, duplex, or condominium complex.[9] Here, Debtor's property is a single family residence. While Debtor does have at least one other individual residing in one of the bedrooms in the home, that fact does not change the property's character as a single family residence. It is also notable that Debtor's schedules, documentation from the Richland County Tax Assessor, and the insurance on the property all support the finding that the property is a single family residence.

Because the McCords Ferry Property is the only collateral securing Royals' claim and is Debtor's principal residence, Debtor cannot modify Royals' claim by bifurcating it into secured and unsecured components in his chapter 13 plan. As a result, confirmation of the March 30, 2016 amended plan is denied.

**2. Motion for Relief from Stay**

Royals seeks relief from stay pursuant to section 362(d)(1), (d)(2), and (d)(4). Royals bears the burden of proof on "the validity of its lien, the amount of its debt, and Debtor's lack of equity."

---

[9] *See Scarborough*, 461 F.3d 406 (property at issue was a "two-story semi-detached residence that was converted to a multi-unit dwelling . . . with one apartment on the first floor and one apartment on the second floor"); *Lomas Mortg.*, 82 F.3d 1 (property at issue is described as a three-family home, with one of the units leased to tenants).

*In re Henderson*, 395 B.R. 893, 898 (Bankr. D.S.C. 2008). Debtor bears the burden of proof on all remaining issues, including lack of cause, the existence of adequate protection, and the necessity of collateral for an effective reorganization that is within reasonable prospect. 11 U.S.C. § 362(g)(2); *Henderson*, 395 B.R. at 898-99.

Here, based on the allegations in Royals' Motion for Relief from Stay, and Debtor's objection in response, it appears that cause exists to grant relief from stay pursuant to section 362(d)(2), because Debtor does not have equity in the McCords Ferry Property, and the property is not necessary for an effective reorganization. With respect to the first requirement, it is undisputed that Debtor does not have equity in the McCords Ferry Property. With respect to the second element, the United States Supreme Court has stated that for this element to be met, there must be "'a reasonable possibility of a successful reorganization within a reasonable time." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 376 (1988).

Debtor's sole sources of income are a small amount of social security income and contributions from Ms. Taylor. As a result, Debtor's current plan is entirely dependent on the substantial contributions from Ms. Taylor. Ms. Taylor's testimony establishes that she is able to provide contributions in the current proposed amount of $1,250.00 per month[10] and is willing to do so for the duration of Debtor's plan. In fact, at the time of the hearings, the trustee indicated that Debtor was paid ahead two months in trustee payments. Debtor has lived in the property for the majority of his life. Debtor, Ms. Taylor, and Ms. Simpson all testified regarding the importance of the McCords Ferry Property to their family.

Despite all of this, it does not appear that a successful reorganization within a reasonable time is possible. Any plan proposed by Debtor would deal only with Debtor's debt - not that of

---

[10] Debtor's amended schedules indicate that Ms. Taylor contributes $1,150.00 per month to Debtor, but testimony at the hearing indicated that Ms. Taylor has made all of Debtor's plan payments to date.

11

Ms. Simpson. Ms. Simpson has waived her discharge; therefore, the debt will not be discharged in her bankruptcy, and she will remain personally liable for the entire amount of the debt. Royals has already obtained relief from stay in Ms. Simpson's bankruptcy case, allowing it to complete foreclosure and become the owner of her half interest in the property. Because Debtor cannot bifurcate Royals' claim, in order to confirm a plan and retain the property, Debtor's plan payments would have to increase substantially. Even with Ms. Taylor's testimony regarding her willingness and ability to contribute to Debtor, it does not appear that this is feasible. Royals is entitled to relief from stay pursuant to section 362(d)(2).

## **CONCLUSION**

For the reasons set forth above, confirmation of Debtor's chapter 13 plan is denied. Royals' motion for relief from stay is granted pursuant to section 362(d)(2). Debtor may propose a new chapter 13 plan within fourteen (14) days of the date of entry of this order.

AND IT IS SO ORDERED.

**FILED BY THE COURT**
**05/11/2016**



Entered: 05/12/2016

David R. Duncan
Chief US Bankruptcy Judge
District of South Carolina